# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF KENTUCKY
# CENTRAL DIVISION
# AT LEXINGTON

| | |
|---|---|
| JERALDINE LEAR,<br><br>    Plaintiff,<br><br>V.<br><br>CAROLYN W. COLVIN, ACTING COMMISSIONER OF SOCIAL SECURITY,<br><br>    Defendant. | CIVIL ACTION NO. 5:13-439-KKC<br><br><br>**MEMORANDUM OPINION AND ORDER** |

\*\*\* \*\*\* \*\*\*

This matter is before the Court for consideration of cross-motions for summary judgment. (DE 12 & 13). The plaintiff, Jeraldine Lear, brought this action pursuant to 42 U.S.C. § 405(g) to obtain judicial relief of an administrative decision of the Commissioner of Social Security denying her claim for Supplemental Security Income ("SSI") benefits. The Court, having reviewed the record, will remand the Commissioner's decision for the reasons set forth below.

**I. BACKGROUND**

*1. Treatment History*

Lear injured her back while working as a licensed practical nurse ("LPN"). [TR 33–35]. Specifically, her injury occurred in June 2002 while lifting a patient from a wheelchair. [TR 33, 275].

Shortly after suffering her injury, Lear sought treatment from neurosurgeon Dr. George Raque, Jr. [TR 275]. Lear routinely saw Dr. Raque from 2002 until 2005. [TR 275, 288]. Initially, Dr. Raque ordered an MRI scan of her back, and the MRI revealed that Lear had

an annular tear and spondylothesis at L5-S1; however, Dr. Raque did not recommend surgery because the tear occurred on the front of her spine and would have required transabdominal surgery—a technically difficult and risky procedure. Hikmet Turan Suslu et al., *One-stage Surgery Through Posterior Approach for L5-S1 Spondyloptosis*, J. Croniovertebral Junction & Spine, (July–Dec. 2011), *available at* http://www.ncbi.nlm.nih.gov/pmc/articles/PMC3486007/. Dr. Raque noted that there was not "anything simple from a surgical standpoint that w[ould] help her" and advised that Lear's treatment comprise of "conservative measures." [TR 277]. Lear's condition appeared to improve throughout her physical therapy ("PT") sessions and with piriformis injections; however, the strain of day-to-day activities combined with her nursing duties caused Lear's back to deteriorate to the point that Dr. Raque concluded that Lear could not "go back to direct patient care activities and is limited to sedentary work." [TR 274–76].

Dr. Raque referred Lear to Dr. Anjum Bux. [TR 288]. Starting in August 2005, after Lear's condition worsened despite continued PT and piriformis injections, Lear saw Dr. Bux for pain management. [TR 288]. Dr. Raque recommended continuous treatment from Dr. Bux. [TR 285].

Lear later received treatment from Dr. Mohammad Shahzad. [TR 332]. Dr. Shahzad, a primary care physician, is Lear's treating physician. [TR 37]. Dr. Shahzad began caring for Lear in 2007 and has treated Lear for neck and back pain; difficulty swallowing; cough and congestion; muscle jerking, numbness, tingling, and visual disturbances; the flu; and a urinary tract infection. [TR 332–36, 350]. Dr. Shahzad completed Lear's Residual Functional Capacity ("RFC") Questionnaire, and determined that Lear could sit for less than two hours in an eight-hour working day, stand and walk for less than two hours in an eight-hour working day, and occasionally lift less than ten pounds. [TR 413–14].

Dr. Shahzad referred Lear to Dr. Maria Pavez. [TR 350]. Dr. Pavez, a neurologist, treated Lear for her back and neck pain, muscle jerking, numbness, tingling, and visual disturbances. [TR 350]. Lear worried that her symptoms might be consistent with Multiple Sclerosis ("MS"). [TR 351]. Lear expressed this concern because her elder sister has MS. [TR 351]. Dr. Pavez scheduled Lear for a brain MRI, cervical spine MRI, and additional testing, but the results of these tests did not indicate that Lear suffered from MS. [TR 350].

*2. Procedural History*

Lear filed her claim for SSI and disability insurance benefits ("DIB") on July 27, 2010, alleging an onset date of June 1, 2003. [TR 173, 179]. The agency denied her application initially and again after reconsideration. [TR 115, 119, 126, 129]. Lear requested review by an ALJ, and a hearing was held on August, 27, 2012. [TR 27–54].

At the hearing, Lear withdrew her claim for DIB. [TR 28]. She testified to her symptoms and daily routine. [TR 29–50]. Lear noted that coping with her lower back and neck pain is debilitating and time consuming and she frequently has to "lay flat on the bed with [her] knees up at [a] 90 degree angle on pillows and alternate heat and ice and let the medication work until [her back] just eases up." [TR 50].

The ALJ's Notice of Decision followed the five-step sequential process; however, the ALJ's decision is notably sparse. For example, the ALJ's decision is devoid of specifics concerning Lear's education and work experience despite Lear's testimony that she completed high school, completed her LPN degree, and worked as an LPN from the time she graduated from the program until her injuries prevented her from working any longer. [*Compare* TR 14–21 (the ALJ's Decision), *with* TR 31–32 (Lear's testimony)].

At the first step, the ALJ determined that Lear has not engaged in substantial gainful activity since her alleged onset date of June 1, 2003. [TR 16]. At the second step, the ALJ

found that Lear suffered from the following sever impairments: "chronic low back and neck pain secondary to degenerative disc disease and chronic obstructive pulmonary disease." [TR 16]. At the third step, the ALJ determined that Lear does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments. [TR 18].

Next, the ALJ reviewed the record to determine Lear's RFC. RFC assesses a claimant's maximum remaining capacity to perform work-related activities despite the physical and mental limitations caused by the claimant's disability. 20 C.F.R. §§ 404.1545(a)(1); 416.945(a)(1). The ALJ's decision does not explicitly state the factors he considered in determining Lear's RFC, despite explicit guidance from regulations 404.1529 and 404.1545. Giving the ALJ the benefit of the doubt, the Court concludes that the ALJ determined Lear's RFC through an examination of the medical documents in her file and assessing her credibility at the hearing. The ALJ discounted Dr. Raque's, Dr. Pavez's, and Dr. Shahzad's medical findings—failing to explicitly note what, if any, weight the ALJ gave to the doctors' medical opinions—without noting those medical opinions upon which he relied. [*See* TR 18–19]. The ALJ then concluded that Lear's RFC enabled her to perform "light work" with the following limitations: lift and carry up to twenty pounds occasionally and ten pounds more frequently; stand or walk for about six hours in an eight-hour workday; sit for about six hours in an eight-hour workday; unlimited ability to push and pull, subject to Lear's weight limits; and occasionally climb, balance, stoop, crouch, kneel, crawl, climb ramps, and climb stairs. [TR 18–19]

After establishing Lear's RFC, the ALJ continued to the fourth step. The ALJ determined that Lear could not perform her past work as an LPN. [TR 19–20]. The ALJ then moved to the fifth step. During the hearing, the ALJ asked a vocational expert ("VE")

whether a hypothetical individual with Lear's limitations would be able to maintain any employment, and the VE testified that this hypothetical individual could work as a housekeeper or a routing clerk. [TR 51–52]. Therefore, the ALJ found Lear not disabled. [TR 21].

## II. ANALYSIS

*1. The District Court's standard of review.*

The decision of the Commissioner must be affirmed unless the ALJ applied the incorrect legal standards or the ALJ's findings are not supported by substantial evidence. *Lindsley v. Comm. of Soc. Sec.*, 560 F.3d 601, 604 (6th Cir. 2009). "Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). In reviewing the decision of the Commissioner, courts should not conduct a *de novo* review, resolve conflicts in the evidence, or make credibility determinations. *See Lindsley*, 560 F.3d at 604–05. Courts must look at the record as a whole, and "[t]he court 'may not focus and base [its] decision entirely on a single piece of evidence, and disregard other pertinent evidence.'" *Sias v. Sec. of H.H.S.*, 861 F.2d 475, 479 n.1 (6th Cir. 1988) (alteration in original) (quoting *Hephner v. Mathews*, 574 F.2d 359, 362 (6th Cir. 1978)). "Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA *fails to follow its own regulations* and where that error prejudices a claimant on the merits or *deprives the claimant of a substantial right*." *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007) (emphasis added).

*2. The standards for weighing medical opinions.*

"The Commissioner has elected to impose certain standards on the treatment of medical source evidence." *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011). Medical source evidence

is evaluated by the process set forth in 20 C.F.R. § 404.1527(c). This regulation notes that the Commissioner should weigh medical opinions according to the following factors: (1) whether the physician examined the claimant ("examining physician"); (2) whether the physician regularly treats the claimant and has an ongoing treatment relationship ("treating physician"); (3) whether medical evidence supports the physician's opinion ("supportability"); (4) whether the physician has provided consistent opinions concerning a claimant's alleged disabilities ("consistency"); (5) whether the physician is a specialist in the field related to the claimant's alleged disabilities ("specialization"); and (6) other factors evident in the medical records ("other factors"). *Id.* Generally, opinions from examining, treating, or specialized physicians are afforded greater weight that nonexamining, nontreating, and generalist physicians. *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 375 (6th Cir. 2013). "In other words, '[t]he regulations provide progressively more rigorous tests for weighing opinions as the ties between the source of the opinion and the individual become weaker.'" *Id.* at 376 (quoting SSR 96-6p, 1996 WL 374180, at *2 (July 2, 1996)).

Medical opinions from treating-source physicians must be given "controlling weight" if the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2). If the Commissioner does not afford a treating-source opinion controlling weight, then then Commissioner must apply the following factors: (1) length of the treatment relationship; (2) frequency of examination; (3) nature and extent of the treatment relationship; (4) supportability; (5) consistency; (6) specialization; and (7) other factors. *Id.* § 404.1527(c)(2)–(6). "Importantly, the Commissioner imposes on its decision makers a clear duty to 'always give good reasons in our notice of determination or decision for the weight we give [a] treating source's opinion.'" *Cole*, 661 F.3d at 937 (alteration in

6

original) (quoting 20 C.F.R. § 404.1527(c)(2)). Plainly, the ALJ *must* assign a specific weight to a treating physician's medical opinion. *Cole*, 661 F.3d at 938; *see also Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 550 (6th Cir. 2010) ("Even if the ALJ does not give controlling weight to a treating physician's opinion, he must still consider how much weight to give it."); *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 408 (6th Cir. 2009) ("[A] finding that a treating source medical opinion . . . is not entitled to controlling weight [does] not [mean] that the opinion should be rejected.").

Alternatively, medical opinions from nontreating physicians are not assessed for controlling weight. Rather, all other medical opinions are evaluated based upon whether the physician examined the claimant, supportability, consistency, specialization, and other factors. 20 C.F.R. § 404.1527(c)(1), (3)–(6).

*3. The ALJ failed to weigh the medical opinions according to 20 C.F.R. § 404.1527.*

The ALJ cites the medical opinions of Dr. Raque, Dr. Pavez, Dr. Hendrickson, Dr. Couch, and Dr. Shahzad—all examining physicians—but the ALJ never explicitly notes how much weight he afforded *any* of the medical opinions in the record. [TR 18–19]. Dr. Raque, Lear's long-time neurosurgeon, and Dr. Shahzad, Lear's treating physician, also found Lear permanently disabled. [TR 275–76, 412–15]. The ALJ does not state how much weight he assigned to either opinion, only noting that "[Dr. Raque] could not explain the claimant's symptoms based on MRI scan findings" and "[Dr. Shahzad's opinion evidence is] not supported by his own treatment notes." [TR 19].

Fatally, the ALJ never assigns *any* weight to Dr. Shahzad's medical opinion. *See Cole*, 661 F.3d at 938 (noting that the failure to assign any weight—either persuasive weight or unpersuasive weight—to a treating physician's opinion constitutes error requiring remand). The ALJ did not discuss whether Dr. Shahzad's opinion deserved controlled weight. 20

7

C.F.R. § 404.1527(c)(2). Implicitly, the ALJ deemed Dr. Shahzad's opinion unworthy of controlling weight, but the ALJ then failed to "apply the factors listed in paragraphs (c)(2)(i) and (c)(2)(ii) of this section, as well as the factors in paragraphs (c)(3) through (c)(6) of this section in determining what weight to give the opinion." *Id.*

The ALJ could have afforded Dr. Shahzad's medical opinion whatever weight he deemed appropriate, but the regulations contain clear procedural requirements that the ALJ did not follow. *See Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). The procedural requirements "exist[], in part, to let claimants understand the disposition of their cases, particularly in situations where a claimant knows that [her] physician has deemed [her] disabled and therefore might be especially bewildered when told by an administrative bureaucracy that she is not." *Id.* (internal quotations omitted). The procedural requirements are not mere formalities—they exist to safeguard claimant's procedural rights. *Cole*, 661 F.3d at 937. The ALJ disregarded these safeguards.

Finally, Lear complains that the ALJ improperly considered the American Medical Association (AMA) Guides to Permanent Impairment. Specifically, Lear asserts that the ALJ erred in concluding that an "eight percent impairment rating to the whole body" indicated that Lear was not disabled. [TR 19]. The eight percent impairment rating was based upon the AMA Guides, and Dr. Raque used these guides to categorize Lear's impairment. [TR 275]. Although the AMA Guides do not translate to any tangible restriction or functional impairment correlated with disability under the Social Security Act, it is not an error for an ALJ to consider these findings. *Begley v. Sullivan*, 909 F.2d 1482, at *2 n.1 (6th Cir. Aug. 8, 1990) (noting that the AMA Guides "distinguish between 'impairment' and 'disability,' and make clear that, although the evaluation of impairment is a medical function, the determination of disability is an administrative function" and that

an ALJ may use the Guides, along with other medical record evidence, to determine disability).

## III. CONCLUSION

For the reasons set forth above, the Court hereby **ORDERS** as follows:

1. Plaintiff's motion for summary judgment (DE 12) is **GRANTED** to the extent that she requests remand of this matter;

2. The Commissioner's motion for summary judgment (DE 13) is **DENIED**;

3. The decision of the Commissioner is **REVERSED** pursuant to sentence four of 42 U.S.C. § 405(g) and this matter is **REMANDED** to the Commissioner for proceedings consistent with this opinion; and

4. A judgment consistent with this Memorandum Opinion and Order will be entered contemporaneously.

Dated this 6th day of November, 2014.

KAREN K. CALDWELL, CHIEF JUDGE
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY